Good morning, Gerald Newton. On behalf of Appellant Ortiz, I'm going to attempt to reserve three minutes for rebuttal. How many minutes, I'm sorry? I'm sorry? How many minutes? Three. And I also am in the unfortunate position of having to apologize to the court that there is a typographical error in the reply brief that could make a difference in finding a case. In the reply brief, I cite People v. Brock at 38 Cal 3rd, and in the brief cited as page 10, and in the quotes at 191, the actual site is 38 Cal 3rd, 180 at 191. It doesn't make a difference with a book, but it makes a big difference electronically to find the case. So it's 38 Cal 3rd, 180 at the correct page. There's just a minute of your time on that, but go ahead. Cross-examination is supposed to be the great engine for seeking the truth. This is a case where that great engine was substantially derailed in the California courts. Mr. Ortiz, through counsel, attempted to follow up on examination started by the prosecutor with regard to why the primary prosecution witness appeared reluctant to testify and did not want to testify. The prosecution elicited this information to put the witness and Mr. Ortiz in as unfavorable light as possible in the course of the trial, and then when defense counsel tried to show what really has been happening and why this impression that the prosecutor had created about the witness was false, he was prohibited from doing so. This case clearly is contrary and an incorrect application of the law to Davis, to Older, to Vanarsdale. What makes this case particularly egregious is that the prosecution brought up the subject that the defense was prohibited from going into, as they did in Davis and as they did in Older, and then the defense was prohibited from demolishing the position of the prosecutor and showing the reason why the prosecution witness was testifying favorably. I'm going to assume for the moment that you're right as to the confrontation clause. Okay. I'd like to talk about harmless error. Okay. In this particular instance, you have only two significant pieces of evidence that really tie the defendant to the alleged offense. The first is the testimony, and I think that everybody would understand or agree that that testimony shouldn't be considered when cross-examination is eliminated. Well, that's what I want to ask. I think one can read Vanarsdale that way, i.e., if there is a confrontation clause problem, you look at the particular witness, you decide whether it would have put that witness in a different light, and if so, I think they're saying, but I don't know whether the later cases follow up on this, you kind of do a harmless error without that witness. Is that what you're saying? Yes. I believe that to be true. And also, the significant thing about this is the only other evidence tying Appellant Ortiz to this crime came from the other testimony of the witness that was given by Fuller. And the photographs. I'm sorry? And the photographs. Well, the photographs, I always find this interesting. The prosecution's position now is, ah, we can prove this case. There wasn't any problem. All we need is the photograph, and this case is over. Well, and Nels' testimony. Well, yes, but ñ and Fuller's testimony. But the problem with that case is, the problem with this is, we're looking at the is a statement, a testimonial statement, not under oath and not subject to cross-examination, now all of a sudden reliable and can be considered in confrontation, and a clear error in the right to confrontation by the same witness. Well, I mean, that leads to another question, which is how much do you spin out about what would have happened had the cross-examination been allowed? And doing the harmless error, just a minute. I mean, I gather, had the cross-examination been allowed, then ñ well, first of all, there's had the cross-examination been allowed. Then there's had you ñ and there were two pieces of the cross-examination. One was this notion that she had been coerced or threatened, and the other is that she had recanted at some point. Yes. At least as to the second, had that come up, I gather that under California law the prior statement would have come in in the merits. Is that right? How do we consider that? Does it matter? Can we go down that line? I'm confused if you're speaking with regard to the threat or if you're speaking to ñ Not the threat. I'm not talking about the threat. Okay. The recantation. Had she been allowed to be examined about the recantation, under California law, everything then would have been fair game, the way I understand California law. Comment on the merits, not just as ñ Correct. California law is unusual to a certain extent in that it allows prior statements, either consistent or inconsistent, to be accepted for the truth of the matter asserted, which essentially makes the prior statement an unsworn statement that was testimonial taken, being allowed to be admitted that would appear to be clearly in violation of Crawford. But I don't know that that issue has come up. Well, except she was testifying. Crawford says if she shows up and testifies, everything's fair game. Well, but I don't mean ñ I believe that's what Crawford means. What Crawford said, if she shows up under the confrontation clause, everything's fair game. Had she walked up to the stand and smiled and not said anything, testified to the prosecution and said, I refuse to answer any of your questions to the defense counsel, I don't think Crawford would have said that's a meaningful opportunity to cross-examine, as was talked about 15 years or 20 years earlier in Poynter. Poynter makes it clear that the fact that a witness is there doesn't make a difference. The fact is, can you meaningfully cross-examine that case? Otherwise, you'd have a picture of her show in the courtroom and there's no confrontation problem. Can I just get the context of this? Is it correct that the context of the court's ruling was in the context of asking Marion why she didn't talk further with Investigator Nells? That was the ñ That was the context. That was the context that was brought up by the prosecution. So it wasn't in the context of asking Marion what happened that night, what happened with the assault. Correct. The context was quite narrow. Why didn't you talk to the investigator? That was the prosecution context. Second thing I'd like to make clear or ask about is what kind of proffer was made in this case as to what her answers would have been. Okay. There was an extensive proffer. There had been a previous motion to disqualify the district attorney's office. There was a declaration ñ So we're talking about a proffer after the court ruled that ñ Yes. There was a proffer before the trial started about what she would say. There was a pro-offer before the court ruled ñ When her testimony was precluded. And there was a testimony in the motion for new trial with the proffer. What was the proffer made then? And, of course, if it was specifically related back to the earlier proffer, then you can include that as well. Yes. What specifically was the proffer made? That representative of the ñ that the district attorney talked to a member of his staff, that the member of his staff was a relative of the family. This relative called the father of the wife and told the father of the wife that if the wife testified and if the wife changed her testimony, she would be charged with perjury and lose her child. Well, but wasn't ñ the way I remember that testimony, it wasn't just if you changed your testimony. It was you've got to get up there and tell the truth. No. No, no, no. That's what the prosecutor ñ that's what the prosecutor said in his declaration. That wasn't the offer of proof made by the defense. Okay. So the proffer was nothing about you've got to tell the truth, and if you don't tell the truth, you're going to be in trouble. The proffer was if you don't say it exactly the way you said it before. They said the proffer was you've got to tell the truth. If you don't tell the truth ñ Well, but ñ And I believe was ñ Okay. But that's different. It's different to say I'm being threatened with consequences if I don't tell the truth. That's a different problem than if she's saying I'm being threatened because I'm going to change my story so that now I'm going to tell the truth. And I understand ñ I need to know what the proffer ñ which way the proffer played that one. I understand that. And in my rebuttal, I will read it directly from the record so that it's clear. Well, I can read it from the record. If I can. Basically. I'm running out of my time. I'm happy to keep talking, but I don't want to infringe on time. All right. Why don't you go back and we'll give you a minute in rebuttal. Yes, sir. Good morning, Your Honors. California Deputy Attorney General Cory Robbins for the Respondent. With respect to Judge Eble's question, the very narrow context of the objection during trial in those proceedings and the offer of proof was that the victim witness had declined to speak to Investigator Knowles. That actually occurred on December 10th before the purported threat was made. The purported threat was made after that, which is my reading of the record. The preliminary hearing is going to be the next day. And if Your Honors carefully scrutinize the record, you'll see that when the prosecutor spoke to the victim witness's relative, he already knew that the victim witness had refused to speak to the investigator. But it seemed to me at trial, and I would have to go back and read what happened at the discussion, but it was my understanding that although it was cut off at that point when the question was why didn't you speak to the investigator, I mean, she also didn't speak to him as I understand it afterwards either. She just didn't talk to him. That's correct. On October 10th. And so it wasn't an irrelevant point. But more than that, it was clear that the intent was to ask a bunch of follow-up questions, including about the recantation and so on, and it was all cut off. In other words, the fact that that's the point at which it was stopped doesn't mean that that's the only point at which they wanted to cross-examine her about. They wanted to cross-examine her about why she didn't talk to the prosecutors, why she didn't testify, why she testified as she did, whether she recanted, why she didn't give her recantation. But they were cut off at the outset, so there was nothing they could do. The defense lawyer could do. So it doesn't seem sensible to me to limit our consideration of the harmlessness to the question of why she didn't talk to the prosecutor. Okay. Well, I'll move on from that point. I'd like to make one other preliminary point. Do you have a response to that? Is there a reason why we ought to be just worrying about why? Yes, absolutely. Because she had come up with her own motive for not speaking to the investigator before this purported threat even occurred. And that motive was she didn't want to, I imagine, the family learned. But that doesn't have to do with whether she could cross-examine her. I mean, then they could say that. But the question is why couldn't she? I thought you were trying to tell us that because it only arose with regard to the question of why she didn't speak to the prosecutor. That's the only thing we should consider in a harmlessness or in a merits determination as to the Confrontation Clause. And what I want to know is why is that the case? If they were just cut off at the pass and they couldn't have gone into any of these other things either. Right. Well, just looking at it narrowly, as Judge Ebel pointed out. Well, I wasn't pointing out anything. I was asking a question. That would be my response. But let's look at it more broadly. I don't hear your response. What is your response? My response is that since the question was motive of why she didn't speak to him, it was almost an irrelevant point because she had already come up with her own motive for not speaking to the DA's investigator. But then they went up to the bench and they talked about the recantation. They talked about a number of things. And the judge said you're not doing any of it. Well, that's true. But let's talk about the recantation. Her own attorney told the trial court that there was no recantation. So what? So that's why you have a trial. She either says there was or she says there wasn't. I mean, she – her own attorney told the court she was not being pressured, there's no recantation, that he was trying to protect her from claiming murder. Fine. That she said there wasn't one. That doesn't answer the question of whether she could be cross-examined on it or not. Well, fair enough, Your Honor. Is there any evidence she did recant? That she did recant? Well, I think that there was. I think it was her husband, I think it was. The defense counsel told the court that she had just recanted during lunch. During lunch and talking with her, when she was talking with her husband? Correct. That following that prior to lunch. Her husband said that she had recanted while talking to him. But I thought what they really said was that they had decided, well, I can say anything I want because nobody knows the truth. And that's what her attorney said. And is that right? That's exactly correct, Your Honor. I'm trying to figure out what this cross-examination was. Because this cross-examination problem started before they ever had lunch. Well, my understanding of the record is that everyone thought she was going to come into court and testify consistently. Petitioner was on bail. And Petitioner and the witness went to lunch. Actually, the prosecution thought she was going to come into court and recant. They said so. And that's why they had an expert witness standing by who was going to testify about domestic abuse cases and so on. Initially, at the beginning of trial in the opening statement, the prosecutor indicated that he did not know what the witness was going to say. But as the trial judge's comments demonstrate, he was totally surprised at this new turn of events because he said prior to lunch and that very morning they had all discussed what the witness's proposed testimony was going to be. And he understood she was going to testify consistently with her earlier statement. So it was a surprise at that point. Everybody was surprised. Your fundamental point in the briefs is not a harmlessness point, which you make briefly, but that there was no confrontation clause there. I would argue both. Well, you did argue it at some length. But suppose we thought otherwise. What about the harmlessness issue? Well, I think in light of the evidence, the fact that we have Gerardo Gonzalez's testimony, which establishes that Petitioner was angry and threatening violence around the time this was supposed to have occurred. And then the next day, the victim witness went to the police station with her family members, displaying these injuries photographs were taken. She described what the events were. She told the police officer she wasn't going to put up with it anymore. She wasn't going back. This evidence all was properly. So the evidence would have been that somehow what she said to Knowles would have come in in the case, didn't she? Correct. And how would that have happened? As inconsistent statements. I'm sorry? As inconsistent statements by the witness. If she had testified. Suppose she didn't recant, but the testimony of the purported threat came in. But she didn't actually recant. Then what? If she did actually recant? No, she didn't. Oh, she didn't. But she did tell the story about why she thought she had to testify that way. Well, I think then we're right there underbreaked in harmless error. The jury's left with the question of, okay, we have all this evidence that something did happen as alleged. The witness is now telling us that she feels compelled to testify in accordance with the police report. And what's left? What's the jury to do with that? There's good, strong evidence that this incident did occur. And the good, strong evidence is, this is the technical point that I'm interested in. I was surprised when I reread Van Arsdale to notice that it does, it at least arguably says, and I don't know what your position is on this, that if there was a Confrontation Clause problem with regard to a particular witness, in doing the overall harmlessness determination, that witness's affirmative testimony is not taken into account. Is that your understanding of Van Arsdale? Not at all, Your Honor. And I think under Brecht, and we are in ADEPA, so we have to first find that there was an unreasonable application, not simply an incorrect application of Van Arsdale, which I don't believe we can find. But under Brecht, I don't think that there is such a limitation. I think we would have to do this witness by witness. Well, I remember Van Arsdale applying a five-part test.     I'm not sure whether that's what's happening here. And I think we would have to do it after it gets to the harmlessness question. But first, there's a discussion that says we don't look at the whole picture. We look at witness by witness, and then we go to the whole picture. That's the part that I'm talking about. I didn't read Van Arsdale the same way. All right. I think when Your Honor considers the entire record here, maybe there's some guidance in the trial court's comments when it denied the new trial motion, where it said that allowing the proposed cross-examination in questions would have been tantamount to suborning perjury. At some point, the trial court has to have the power to make some kind of a finding that it's not merely cross-examination, but it's something more. But how can that decision and determination be made without hearing her testimony? I think once her attorney told the court. But that's not evidence, and that's filtered. I mean, that's not a very reliable basis for making a determination of subordination of perjury, is it? I think in this case, given the facts, yes, it was. I think the trial court was entitled to rely on representation. Her attorney was an officer of the court. He stood there and he said, she's being worked by petitioner over lunch. I'm trying to prevent her from committing perjury. Can I go to the recantation again? Yes. What about the threats? The threats. Well, let's look at the threats. The threat was that in December, a family member told her this information about losing the child and going to jail. She didn't testify consistently. The prosecutor disavowed that threat in open court at the prelim the very next day. And guess what? She never testified at the prelim. There was an objection. She didn't testify. So any threat that she had to come to court and testify was off the table at that point. All right. So she just forgot about the whole thing? She didn't forget, but there was no reasonable basis to believe that she was going to be sanctioned in any way for anything. Then she had counsel at trial who was advising her. And as the trial court found, she was well advised and knew her options. Just the mere fact that a family member expressed these thoughts, which were incorrect, to this young lady doesn't mean that the entire proceedings are therefore tainted following that. In fact, as the district judge found, any prejudice from this was cured by the passage of nearly a year and the fact that she was represented and the fact that nothing happened at the prelim when she did not testify. And was she – did she say that – was a declaration from her that the threat was you're going to lose your child if you don't testify as you did previously or you could lose your child if you come in and testify falsely? My understanding is she was stating that she thought she had to testify consistently with her previous statement. And that's what she said? Correct. Okay. Not – and what did she say that the investigator told her? Not what she thought, but what words did the investigator use to her, that you have to testify the way you did before or that you have to testify truthfully? Well, that didn't come from the investigator. That came from a clerical employee. Well, okay. But still. The investigator – she claimed that the words were she had to testify in accordance – I believe in accordance with her prior statement. You know, we're way over your time, but the fact is, at least if you look at her father's affidavit, her father says what he was told was she didn't tell the truth, she could be sent to jail. He said that it sounded to him as if it was a threat that she would be punished if she deviated from the original statement. She says the same thing. So nobody says that the statement made to them was that she had to testify in accordance with the other. Right. But I understand Petitioner's position to be that it's the state of mind of the witness as opposed to what the other person said. Well, she said – and you are way over your time, so let's – well, my colleagues have questions. But what she said was the message was that if I didn't testify the same as my original statement, I could go to jail and lose my baby. That's what she said. And that was the proffer. You agree that that was the proffer? By her counsel – by defense counsel before it was refuted by her own counsel, yes. Okay. All right. Thank you very much. Thank you, Your Honors. The proffers are an excerpt of record on page 111, and that's by the father, and on 113. I just read from that. And Your Honor just read that. There's some confusion of the timing of what just happened. She was – people came out before the preliminary hearing. That's when she didn't want to talk. Subsequent to that, she got the threat that she perceived as if she didn't testify I'm sorry. It was before the preliminary hearing. It was before the preliminary hearing. Then they had the preliminary hearing. Right. Then, before trial, Knowles comes out to interview her again. Right. And she doesn't. This is just before trial. At that point in time, she tells Knowles, one, she'd been threatened that she would lose her child, and two, that she'd fall down on a rocking chair and hurt herself. Knowing this, the prosecutor asks her about the conversation with Knowles to get in what he considered to be favorable evidence. At that point in time, defense counsel was not able to rebut it. There is nothing in the record that indicates that this woman was ever told, if you get up and testify, you will not lose your child. That is nowhere in there. There is nothing in this record where she was told after this happened, before the preliminary hearing, ma'am, this was a big mistake. We're sorry there was confusion about this. We're not going to take your child. Okay. Thank you very much. Thank you, both counsel. The case of Ortiz v. Yates is submitted.
judges: Ebel, Fernandez, Berzon